Filed 9/23/20

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES ANTHONY OLIVER,<br><br>    Defendant and Appellant. | E070859<br><br>(Super.Ct.No. FWV17002966)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Daniel W. Detienne and Kyle S. Brodie, Judges. Affirmed.

Randi Covin, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.B and III.C.

1

Defendant James Alexander Oliver challenges his convictions for human trafficking Jane Doe (count 1) and D.A. (count 4), and his sentence. He contends: (1) his conviction on count 4 for human trafficking an adult in violation of Penal Code[1] section 236.1, subdivision (b), (hereafter section 236.1(b)) must be reversed because the offense includes the element the victim did not consent to his or her restraint or confinement, and there is no substantial evidence D.A. did not consent; (2) his conviction on count 4 must be reversed because the trial court erred by not instructing the jury sua sponte on the element that D.A. did not consent to her restraint or confinement; (3) his conviction on count 1 for human trafficking a minor in violation of section 236.1, subdivision (c), must be reversed because the trial court erred by permitting the People to admit hearsay evidence of Jane Doe's age at the time of the alleged offense; and (4) during sentencing, the trial court erred by not considering his present ability to pay various fines and fees, as mandated by *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), so we must strike those fines and fees and remand for a hearing on his ability to pay.

In the published portion of this opinion, we conclude the lack of the victim's consent is not an element or an affirmative defense of the offense of human trafficking an adult in violation of section 236.1(b); the record contains substantial evidence from which a jury could conclude beyond a reasonable doubt that defendant trafficked D.A.; and defendant forfeited his claim of *Dueñas* error with respect to the maximum

---

[1] Unless otherwise stated, all statutory references are to the Penal Code.

2

restitution fine imposed at sentencing, and his claims of reversible error about other fines and fees lack merit.

In the unpublished portion of the opinion, we conclude the trial court accurately instructed the jury on human trafficking as alleged in count 4; defendant forfeited his claim of evidentiary error on count 1 by not timely and specifically interposing a hearsay objection below; and his trial counsel did not render ineffective assistance of counsel by failing to so object.

Therefore, having found no reversible error, we affirm the judgment.

I.

PROCEDURAL BACKGROUND

By information, the People charged defendant with human trafficking of a minor (Jane Doe) for a sex act (§ 236.1, subd. (c)(1), count 1), pimping a minor (Jane Doe) 16 years of age or older (§ 266h, subd. (b)(1), count 2), pandering by procuring a minor (Jane Doe) over 16 years of age (§ 266i, subd. (b)(1), count 3), human trafficking D.A. with the intent to pimp her (§ 236.1(b), count 4), pimping D.A. (§ 266h, subd. (a), count 5), and pandering by encouraging D.A. to become a prostitute (§ 266i, subd. (a)(2), count 6). In a first trial, the jury convicted defendant on counts 2, 5, and 6, but the trial court declared a mistrial on the remaining counts because the jury was deadlocked. The People filed a first amended information realleging counts 1, 3, and 4. Following a retrial, a second jury found defendant guilty on the remaining counts.

The trial court sentenced defendant to state prison for 22 years eight months, consisting primarily of an aggravated sentence of 20 years for his conviction on count 4

3

for human trafficking D.A. The court expressly found that defendant lacked the present ability to pay attorney fees for his appointed counsel or the costs for presentence investigation. However, the trial court imposed a $40 court operations fee for each of his six convictions ($240) (Pen. Code, § 1465.8); a $30 criminal conviction assessment for each of his six convictions ($180) (Gov. Code, § 70373); a maximum restitution fine of $10,000 (Pen. Code, § 1202.4, subd. (b)(1)); and a maximum parole revocation restitution fine of $10,000, stayed pending successful completion of parole (Pen. Code, § 1202.45, subd. (a)). In addition, on count 4, the court imposed a fine of $96,000 "[b]ased on the significant economic benefit provided to [defendant] over the course of his exploitation" of D.A. Defendant did not object to the fines and fees on any basis.

Defendant timely appealed.

## II.

## FACTS[2]

D.A., who was 23 years old during defendant's 2018 retrial, testified that she first met defendant when she was 11 years old. When she was 15 years old, D.A. began dating defendant's son, who was a classmate. The relationship ended a month or two later when defendant's son punched D.A. in the face. D.A. spoke to defendant about the assault and told him she did not want to go home with a mark on her face. Defendant told her she "didn't have to worry about it and that it was fine to be with him for awhile." Soon thereafter, D.A. began a sexual relationship with defendant, who was almost

---

[2] Because defendant only challenges his convictions on counts 1 and 4 in the retrial and his sentence, we need not recite the facts presented in the first trial.

20 years her senior. She testified, defendant "tried, you know, touching me and stuff and at first I kind of wasn't with it, but then it got to happening a little too much and I just gave up." D.A. began having sexual intercourse with defendant, and they "were together for a lot of years after that." Defendant told her, "You are my bitch now," meaning "I belonged to him now and I was to do what [I] was told."

D.A. testified that, starting when she was 15 years old and continuing for seven to eight years, she "worked" for defendant as a prostitute "selling [her] body for money." At that point, she was living with defendant in a motel room in Fresno. D.A. testified defendant told her where to "stroll," which is "where prostitutes walk," and how to conduct herself with a client and while she was "walking," i.e., what and what not to do. Defendant instructed D.A. to "use protection" and to always "use a condom." He bought condoms for D.A. to use while prostituting herself, but "[a] lot of times [she] would buy them [herself]." Defendant also told her to "always keep [herself] protected" by having mace or a knife with her in case "a client wanted to turn on [her]."

D.A. worked as a prostitute every day. If she did not want to work, defendant would argue with her and sometimes use physical violence to get her to work. D.A. charged clients according to the time they spent together, but defendant did not want her to charge less than $100. She gave all her earnings to defendant and kept none for herself. A few times, she tried to keep some of her money, but "it would end up going right back to him because we would need it for other things." The money D.A. earned as a prostitute paid for hotel rooms, food, marijuana that she and defendant smoked, and clothing.

D.A. procured her "dates or clients" by "strolling" the streets and from the Internet. When she worked on the street, D.A. kept in communication with defendant by cellular telephone.[3] Before taking a client to the hotel room, she would text defendant a "peace sign" to let him know she was on the way and for him to leave the room. Defendant also used text messages to direct D.A. in how to comport herself. In one instance, D.A. argued with defendant over the phone while working on the street. Defendant sent her a text message, telling her she was not to "do the walk down the street ranting into the phone."

Besides Fresno, D.A. testified she worked for defendant as a prostitute in other California cities,[4] and she traveled by train, sometimes "automatic," meaning traveling by herself. D.A. testified that even when she traveled alone, she "wasn't necessarily alone, I was still being tracked." Defendant tracked D.A. with an application installed on her cellular phone. Once activated, the application allowed defendant "to know [her] exact location" and for D.A. to "check in" with him.

---

[3] Corporal Lefler testified that D.A. constantly checking in and giving defendant updates was important because it allowed defendant to know "exactly how busy she [was], to keep track potentially of how much money she [was] making, [to know] where [she was] located . . . and when not to be in the room."

[4] According to Corporal Lefler, it is common for pimps to have their prostitutes work a "circuit" or "series of cities" to "chase the money." "Essentially what they do is look to find out where the highest population of prospective buyers is going to be at one time and follow that." In addition, moving prostitutes around from city to city gives pimps "a sense of protection or anonymity so that it makes it difficult for them to be detected by law enforcement."

D.A. testified defendant was not violent with her too often at first but, as time passed, "it became more and more often." Defendant would use physical violence if she "didn't do what he wanted me to do," or if she "said something that he didn't like." For example, in 2011, when she was 16 or 17 years old, defendant hit her across the face with a belt in the Fresno motel room where they were staying. D.A. had been with her mother all day long. When she returned, defendant accused her of having sex with someone and hit her with a belt. When the police responded to a report of a domestic disturbance and knocked on the door to the motel room, defendant was with her in the room. D.A. was crying and had a swollen lip.

D.A. did not immediately tell the police "everything that was going on." Later, the police asked D.A. some questions and she told them "bits and pieces," but she was still young, and she lied to cover up for defendant so he would not get in trouble. She told one officer that nothing physical had happened, and she told another officer that she had fallen and hit her head on a dresser. D.A. told the police she was a prostitute, but she said defendant did not make her give him all the money she earned. Instead, D.A. said she gave defendant money because she wanted to and because he protected her and bought her clothing. At first, D.A. denied that she had sexual intercourse with defendant but later admitted to having had sex with him three times. Eventually, she told the police defendant was upset when she came back to the motel late. He yelled at her, and then he took a belt and hit her once across the face. Although D.A. went home with her parents after that incident, she stayed in a relationship with defendant.

Defendant was also physically violent with D.A. after he began pimping Jane Doe. D.A. did not like that defendant brought in another prostitute, and she felt defendant was lying to her. D.A. witnessed defendant have sexual intercourse with Jane Doe at the motel. She never saw Jane Doe give defendant money earned from prostituting, but she did see Jane Doe put money in a drawer where D.A. herself placed her earnings. During altercations about his relationship with Jane Doe, defendant punched and slapped D.A., and he told her to mind her own business. Defendant also told D.A. she did not "run anything," and it was his "program." He said Jane Doe "was his bitch," and D.A. "wasn't to run her off." He sent D.A. a text message accusing her of "choosing" or leaving him for another pimp because Jane Doe had chosen to be his prostitute. Defendant told D.A. she was now the "bottom bitch."[5] He became angry with D.A. when she argued with him because it would leave the impression that Jane Doe could disrespect and argue with him as well. D.A. got tired of defendant hitting her, so she told him she would not argue with him anymore and would "keep doing" what she was doing and "be quiet." Despite feeling he was replacing her with Jane Doe, D.A. continued to work for defendant as a prostitute and give him her earnings.

Soon after Jane Doe began prostituting for defendant, D.A., Jane Doe, defendant, and his sister traveled to Oceanside for two days or so, where D.A. worked as a prostitute. Defendant told D.A. to register a hotel room under her name because she was

---

[5] Corporal Lefler testified a "bottom bitch" is a pimp's most trusted and productive prostitute, and she takes on some of the roles of mentoring and managing the pimp's other prostitutes, thereby reducing the pimp's visibility. The "bottom bitch" benefits by having more respect within the pimp's organization, but she is still subject to discipline.

the only one with an identification. D.A. posted advertisements in the escort section of the now-defunct Web site, Backpage.com. Some months earlier, defendant taught her how to create advertisements by using photos of other women and copying the text from other advertisements, though she never used such advertisements in Fresno. D.A. only attracted two clients in Oceanside from the Internet, and she gave the money she earned to defendant. She did not recall whether Jane Doe had any dates in Oceanside, and she did not see Jane Doe put any money in defendant's drawer while there, but she did see Jane Doe put money in the drawer when they traveled to Ontario.

D.A. did not want to go to Ontario because she had two outstanding warrants in Ontario and Fontana for prostituting herself there for defendant. D.A. checked into a hotel in Ontario, and both she and Jane Doe worked as prostitutes. D.A. had about four dates while in Ontario. Defendant asked D.A. to help create an Internet advertisement for Jane Doe. The day before D.A. was arrested in Ontario, defendant socked her in the face and left a bruise. Photos taken at the time of her arrest showed other bruises and marks, including marks on her back from where defendant had hit her with a belt.

Police responded to the hotel to look for a missing girl—Jane Doe—who was possibly involved in prostitution. The officers did not know what room she was in, so they knocked on several doors looking for her. When officers knocked on their door, D.A. did not immediately open the door. Defendant's brother had been in an altercation that morning with "his female," and D.A. thought the police were there to talk to defendant about it. Only D.A. and Jane Doe were in the room; defendant had already left.

9

D.A. was wearing provocative and minimal clothing when she answered the door. Jane Doe was crouched down and against the wall next to a dresser; she appeared to be hiding when the police entered the room. She lied to the officers about her identity. Officers found used condoms and a pack of unused condoms in the room. Using Jane Doe's cellular phone number, the officers found advertisements on the Internet for her.

D.A. was uncooperative with the police at first. She did not immediately tell them what was going on and lied to them to protect defendant. She told the officers she kept her money, though in fact she had none on her. Although she knew Jane Doe was working as a prostitute that day, D.A. told the officers she did not really know Jane Doe, and she "did not know her business." About 15 to 20 minutes later, Corporal Lefler arrived and spoke to D.A. At first, she denied that she was a prostitute, but she eventually admitted she was there at the hotel as a prostitute. She told Lefler she was independent and worked for herself. Lefler told her she was lying. He said he had spoken to prostitutes from Fresno, and he had never known a prostitute to be independent. Lefler also told D.A. that he was aware of her outstanding arrest warrants. D.A. was arrested and taken to the police station, where she was told she would be released and not have to spend the night in jail if she cooperated. After speaking to the police and being released, D.A. returned to Fresno. Defendant contacted her there two days later and told her he had been arrested. He told D.A. "to try to have his back."

Defendant had social media profiles under the names "Gfoot Hoodologist" and "Oliver Stoned." The "Gfoot Hoodologist" profile was based on the "pimping culture" and included many prostitution-related memes, messages, videos, and vulgar photos.

10

Similar memes and photographs were discovered in defendant's cellular phone. The "Oliver Stoned" profile was related to "weed" or the marijuana culture because defendant also sold cannabis.

Defendant testified he was romantically involved with D.A., but he did not have sex with her until after she had turned 18 years old. He knew D.A. and Jane Doe were prostitutes, but he denied he was their pimp and denied he took money from them. Defendant testified he had traveled to Southern California with D.A. and Jane Doe to renew a cannabis card, not to pimp them.

III.

DISCUSSION

A.      *Substantial Evidence Supports Defendant's Conviction for Human Trafficking an Adult* (*Count 4*).

Defendant contends his conviction on count 4 for human trafficking an adult is not supported by substantial evidence. He argues human trafficking an adult in violation of section 236.1(b) contains the element that the victim did not consent to his or her restraint or confinement, and the prosecutor did not present evidence from which a jury could conclude beyond a reasonable doubt that D.A. did not consent. We disagree with defendant and conclude lack of consent is neither an element nor an affirmative defense of human trafficking an adult in violation of section 236.1(b). And we conclude the record does contain substantial evidence that defendant trafficked D.A.

11

*1.      Lack of consent is not an element of or an affirmative defense to the offense of human trafficking an adult in violation of section 236.1(b).*

Whether the victim's lack of consent is an element of the offense of human trafficking an adult in violation of section 236.1(b) is a question of statutory interpretation we review de novo.  (*People v. Prunty* (2015) 62 Cal.4th 59, 71.)  "We interpret that section by starting, as we must in all problems of statutory interpretation, with its text.  [Citation.]  When interpreting the text of a specific provision, we consider the language of the entire legislative scheme and related statutes in ascertaining the Legislature's intended purpose."  (*People v. Rodriguez* (2016) 1 Cal.5th 676, 686.)

"'If the statutory language is unambiguous, then its plain meaning controls.  If, however, the language supports more than one reasonable construction, then we may look to extrinsic aids, including the ostensible objects to be achieved and the legislative history.'"  (*People v. Ruiz* (2018) 4 Cal.5th 1100, 1106.)

Ordinarily, consent of the victim is not a defense unless lack of consent is an element of the offense.  (*People v. Carr* (2000) 81 Cal.App.4th 837, 842; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Defenses, §§ 97-98, pp. 544-546.)  Many sex crimes expressly include the element that the act was accomplished against the victim's will.  (E.g., Pen. Code, §§ 261, subd. (a)(2) [forcible rape], 262, subd. (a)(1) [spousal rape], 286, subd. (c)(2)(A)-(C) [forcible sodomy], 288a, subd. (c)(2)(A)-(C) [forcible oral copulation], 289, subd. (a)(1)(A)-(C) [forcible sexual penetration], 243.4, subd. (a) [sexual battery].)  "'"[A]gainst the will" of the victim is synonymous with "'without the

victim's consent.'""" (*People v. Andrews* (2015) 234 Cal.App.4th 590, 602 [sexual battery]; see CALCRIM Nos. 935, 938.)

For most of the sex crimes listed, *ante*, "consent" of the victim is statutorily defined as "positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6.) As this court has previously stated, a victim's mere submission to an act does not amount to "actual consent." (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460 & fn. 3.) "For instance, a victim's decision to submit to an attacker's sexual demands out of fear of bodily injury is not consent [citations] because the decision is not freely and voluntarily made (§ 261.6). A selection by the victim of the lesser of two evils—rape versus the violence threatened by the attacker if the victim resists—is hardly an exercise of free will." (*Id*. at p. 460, fn. 3.)

The offense of human trafficking an adult, however, does not expressly contain the element that the act was accomplished against the victim's will or that the victim did not consent to his or her exploitation.[6] "A person who deprives or violates the personal liberty of another with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking . . . ." (§ 236.1, subd. (b).) "'Deprivation or violation of the personal liberty

---

[6] On its face, the crime of human trafficking of a minor also lacks the express element of the victim's nonconsent. (§ 236.1, subd. (c).) Indeed, the statute expressly states consent is not an *affirmative defense* to the crime of human trafficking a minor either. (§ 236.1, subd. (e) ["Consent by a victim of human trafficking who is a minor at the time of the commission of the offense is not a defense to a criminal prosecution under this section."].)

of another' includes substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person, under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out."[7] (§ 236.1, subd. (h)(3).)

Although lack of consent does not appear on the face of section 236.1(b), defendant argues the plain language of the statute demonstrates it is an element because: (1) by expressly stating that consent is *not* a defense to human trafficking of a minor (see *ante*, fn. 6), the Legislature necessarily indicated consent *is* a defense to human trafficking of an adult; (2) the element that the victim's personal liberty has been deprived or violated "is necessarily inconsistent with consent, which must be freely given"; and (3) by placing the crime of human trafficking in the same chapter as false imprisonment—a crime that includes the same element of violation of personal liberty and requires establishing the victim's nonconsent—the Legislature clearly intended for lack of consent to be an element of the crime of human trafficking an adult.

---

[7] When determining whether the victim's liberty was deprived or violated, and when determining whether a defendant used duress or coercion, the jury must consider "[t]he total circumstances" including a list of nonexhaustive "factors" such as the victim's age, the relationship between the victim and his or her trafficker or the trafficker's agents, and any handicap or disability of the victim. (§ 236.1, subd. (i).)

The People respond that the Legislature is vested with the exclusive power to define crimes, "and by its own terms, section 236.1(b) does not specify lack of consent as an offense element."

Defendant's analogy of human trafficking an adult to the offense of false imprisonment is unpersuasive. "False imprisonment is the unlawful violation of the personal liberty of another." (§ 236.) The courts have held that "[f]alse imprisonment occurs 'when "the victim is 'compelled to remain where he [or she] does not wish to remain, or to go where he [or she] does not wish to go.'"'" (*People v. Williams* (2017) 7 Cal.App.5th 644, 672.) 672.) The official jury instruction for felony false imprisonment phrases the gravamen of the offense somewhat differently, stating, "The defendant made the other person stay or go somewhere against the person's will." (CALCRIM No. 1240.) As noted, *ante*, an act that is committed against a person's will means an act committed without his or her consent. (*People v. Andrews*, *supra*, 234 Cal.App.4th at p. 602; see CALCRIM No. 1240.) In addition to lack of consent being an element of the offense of false imprisonment, the courts have recognized consent of the victim is a defense. (See, e.g., *People v. Dominguez* (2010) 180 Cal.App.4th 1351, 1360.)

Unlike false imprisonment, the crime of human trafficking in violation of section 236.1(b) does not require that the deprivation of personal liberty (i.e., the confinement or restraint) is itself unlawful. Instead, confinement or restraint is punishable as the offense of human trafficking if it is done with "the intent to effect or maintain" a separate enumerated offense such as pimping and prostitution. (§ 236.1(b);

15

see CALCRIM No. 1243.) Likewise, whereas deprivation of personal liberty for purposes of false imprisonment has been judicially interpreted to mean one thing, the Legislature adopted a broader definition of deprivation of personal liberty for purposes of human trafficking that, on its face, does not dictate the conclusion that lack of consent is an element of the offense of human trafficking. As noted *ante*, section 236.1, subdivision (h)(3), provides that a deprivation or violation of personal liberty "*includes* substantial and sustained restriction of another's liberty accomplished through force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person under circumstances where the person receiving or apprehending the threat reasonably believes that it is likely that the person making the threat would carry it out." (Italics added.) "'Includes' is 'ordinarily a term of enlargement rather than limitation.' [Citation.] The 'statutory definition of a thing as "including" certain things does not necessarily place thereon a meaning limited to the inclusions.'" (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774; accord, *Federal Land Bank v. Bismarck Lumber Co.* (1941) 314 U.S. 95, 100 [The "term 'including' [in a statute] is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."].)

Although in most human trafficking cases (perhaps the overwhelming majority of them) the victim will not have consented to his or her restraint or confinement,[8] section 236.1, subdivision (h)(3)'s nonexhaustive definition of deprivation or violation of personal liberty leaves open the possibility that a victim may *agree* to have his or her freedom of movement limited by a pimp, for example, to help facilitate and share in the profits of a prostitution ring. Yet, the crime of human trafficking will still have been committed if the deprivation was done with the requisite mental state. Plainly stated, the victim's consent or lack thereof is irrelevant. In other words, consent is not an element of the offense of human trafficking in violation of section 236.1(b), and it is not an affirmative defense either.

Finally, we are unpersuaded by defendant's contention that, by removing consent as a defense to human trafficking a minor, the Legislature implicitly recognized it is a defense to human trafficking an adult in violation of section 236.1(b). "A person who causes, induces, or persuades, or attempts to cause, induce, or persuade, a person who is a minor at the time of commission of the offense to engage in a commercial sex act, with the intent to effect or maintain a violation of Section 266, 266h, 266i, 266j, 267, 311.1, 311.2, 311.3, 311.4, 311.5, 311.6, or 518 is guilty of human trafficking." (§ 236.1,

---

**8** We assume that in many cases, if not most, the deprivation or violation of personal liberty will be inconsistent with the victim's consent. (See, e.g., § 236.1, subds. (h)(1) [defining "'Coercion'" to include a defendant's "scheme, plan or pattern" intended to make the victim believe he or she will suffer serious harm or physical restraint if he or she does not perform the act], (h)(4) [defining "'Duress'" to include implied or direct threats that would "cause a reasonable person to acquiesce in or perform an act which he or she would otherwise not have submitted to or performed"].) But for the reasons stated in the text, we conclude lack of consent is not an element of the offense.

subd. (c); see § 236.1, subd. (h)(7) ["'Minor' means a person less than 18 years of age."].) As noted, *ante*, footnote 6, the Legislature expressly removed the consent of a minor as a defense to a charge of human trafficking in violation of section 236.1, subdivision (c). (§ 236.1, subd. (e).)

The offenses of human trafficking a minor and human trafficking an adult in violation of section 236.1(b) are very different. Human trafficking a minor omits the element of deprivation or violation of personal liberty, so the nonexhaustive definition given to that element in section 236.1, subdivision (h)(3)—which, to repeat, leaves open the possibility that an adult victim might agree to have their freedom of movement limited—is also inapplicable. Therefore, removal of consent as a defense to human trafficking a minor does not necessarily imply application of the defense to the offense of human trafficking an adult.[9]

---

[9] Defendant's request for judicial notice of the legislative history of section 236.1's adoption, filed June 11, 2019, is denied because the plain language of that section is clear and unambiguous with respect to whether lack of consent is an element of the offense of human trafficking an adult. (*People v. Maultsby* (2012) 53 Cal.4th 296, 300, fn. 3. ["'The absence of ambiguity in the statutory language dispenses with the need to review the legislative history.'"].)

For the same reason, we reject defendant's reliance on the rule of lenity. The rule of lenity "'generally requires that "ambiguity in a criminal statute should be resolved in favor of lenity, giving the defendant the benefit of every reasonable doubt on questions of interpretation. But . . . 'that rule applies "only if two reasonable interpretations of the statute stand in relative equipoise." [Citation.]' [Citations.]" [Citations.]' 'The rule of lenity does not apply every time there are two or more reasonable interpretations of a penal statute. [Citation.] Rather, the rule applies "'only if the court can do no more than guess what the legislative body intended; there must be an *egregious* ambiguity and uncertainty to justify invoking the rule.'"'" (*People v. Nuckles* (2013) 56 Cal.4th 601, 611.) Because we find no ambiguity in section 236.1 with respect to the precise question before us, let alone an egregious ambiguity, the rule of lenity does not apply.

18

　　　　　*2.　　Substantial evidence supports defendant's conviction for human trafficking D.A.*

　　　　Defendant's claim of insufficient evidence of human trafficking is dependent on his argument that lack of consent is an element of the offense.  For example, he acknowledges the record contains evidence that he used physical violence against D.A., but he argues there is no evidence from which a jury could conclude beyond a reasonable doubt that she did not consent to her exploitation.  He argues D.A. was free to go when she pleased.  Because we have concluded lack of consent is not an element of the offense, our inquiry is limited to whether there is substantial evidence defendant deprived D.A. of her personal liberty with the intent to pimp her.

　　　　"The principles governing our assessment of defendant's . . . challenge[] to the sufficiency of the evidence are well settled.  We ""must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""  (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'"  (*People v. Wyatt* (2010) 48 Cal.4th

776, 781.)  "'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'"  (*Brooks*, at p. 57.)

D.A. testified that, shortly after she began having sex with defendant—when she was only 15 years old—defendant told her, "You are my bitch now," meaning she "belonged to him" and was to do what she was "told."  Defendant immediately groomed and trained D.A. in how to be a prostitute.  She was required to work as a prostitute every day and to give defendant all the money she earned.  If D.A. did not want to work, defendant argued with her or used physical violence to get her to comply with his demands.  He constantly monitored her using a tracking application on her phone, and he required her to stay in constant communication with him.  Although D.A. was able to travel "automatic" or alone from Fresno to other cities to prostitute herself, she testified, "I wasn't necessarily alone, I was still being tracked."  Although defendant did not use physical violence too often at first, he used it more frequently the longer D.A. prostituted for him.  Defendant hit D.A. when she "didn't do what he wanted [her] to do," if she "said something that he didn't like," and when she quarreled with him about Jane Doe.  She had bruises and marks on her body when she was arrested.  D.A. testified she got tired of the violence and decided to stay quiet.  She also testified that she did not want to

go to Ontario because she had outstanding arrest warrants for prostitution, yet she traveled there with defendant and Jane Doe anyway.**10**

From D.A.'s testimony, a jury could reasonably conclude defendant limited D.A.'s freedom of movement with the specific intent of pimping her. By constantly monitoring D.A., by making her financially dependent on him, and by using verbal and physical abuse to gain her compliance with his demands that she prostitute herself every day, the jury could conclude defendant trafficked D.A. (See *People v. Guyton* (2018) 20 Cal.App.5th 499, 507 [human trafficking conviction affirmed where, inter alia, the defendant isolated the victim, constantly monitored her, made her work when she was exhausted, and made her financially dependent on him].)

B.      *The Trial Court Correctly Instructed the Jury on the Elements of the Crime of Human Trafficking* (*Count 4*).

In a related argument, defendant contends his conviction on count 4 must be reversed because the trial court had a sua sponte duty to instruct the jury on the element of lack of consent, but the court failed to do so. Defendant did not object that the modified CALCRIM No. 1243 read to the jury was inaccurate or incomplete. As the

---

**10** Defendant concedes there is evidence he used force or violence "at times" while D.A. prostituted herself for him, but he argues there is insufficient evidence he made her do anything she did not wish to do during the period alleged in the amended information, i.e., the three years before and including the date of her arrest. Not so. Among other things, the evidence presented to the jury was that defendant used physical violence and the implicit threat of physical violence throughout the seven to eight years he pimped D.A. For example, as stated, *ante*, D.A. testified defendant "socked" her in the face when they were in Ontario, and she had bruises on her body when police raided the hotel. And, the evidence showed defendant monitored and tracked D.A. during the entire period alleged in the amended information.

21

People contend, failure to object to an instruction as incomplete or to request a pinpoint instruction usually forfeits an appellate challenge to the instruction. (*People v. Johnson* (2015) 60 Cal.4th 966, 993.) However, even in the absence of an objection, we may review the correctness of an instruction if error would affect the defendant's substantial rights.[11] (§ 1259; *People v. Johnson*, at p. 993.)

"'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.'" (*People v. Smith* (2013) 57 Cal.4th 232, 239.) "'That obligation includes instructions on all of the elements of a charged offense' [citation], and on recognized 'defenses . . . and on the relationship of these defenses to the elements of the charged offense.'" (*People v. Rubalcava* (2000) 23 Cal.4th 322, 334.)

Because we have already concluded, *ante*, that lack of consent is not an element of or an affirmative defense to human trafficking an adult in violation of section 236.1(b), the trial court simply had no duty to instruct about consent. Defendant does not contend the modified CALCRIM No. 1243 read to the jury was otherwise erroneous or incomplete, so we must reject his claim of instructional error.

---

[11] Because we conclude defendant did not forfeit his claim of instructional error, we need not address his alternative argument that his trial attorney rendered ineffective assistance of counsel by not objecting.

C.     *Defendant Forfeited His Claim of Evidentiary Error Regarding Count 1 by Not Timely and Specifically Interposing a Hearsay Objection.*

Defendant contends the trial court erred prejudicially by permitting the People to introduce hearsay evidence to establish the element of count 1 that Jane Doe was a minor. But, as the People contend, defendant did not object in the trial court on hearsay grounds, and the foundational objection he did interpose was not enough to preserve his claim. We conclude defendant forfeited his claim of evidentiary error.

"We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.  [Citations.]  Specifically, we will not disturb the trial court's ruling 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)

"Evidence Code section 353 provides, as relevant, 'A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless:  [¶]  (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and *so stated as to make clear the specific ground of the objection or motion . . . .*'  (Italics added.)  'In accordance with this statute, [our Supreme Court has] consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" (*People v. Partida* (2005) 37 Cal.4th 428, 433-434.)  "The reason for the rule is clear—failure to identify the specific ground of objection denies the opposing party the opportunity to offer evidence to cure the asserted

defect.  [Citation.]  'While no particular form of objection is required [citation], the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.'"  (*People v. Holt* (1997) 15 Cal.4th 619, 666-667.)

A defendant cannot interpose one specific evidentiary objection and later claim to have preserved an entirely different one.  For example, in *People v. Demetrulias* (2006) 39 Cal.4th 1, the defendant objected at trial to testimony on relevance grounds but on appeal argued the testimony was inadmissible character evidence.  The Supreme Court held that the defendant did not preserve his claim of evidentiary error.  "Contrary to defendant's argument, a relevance objection does not, in itself, alert the trial court to the claim that the testimony objected to is inadmissible character evidence."  (*Id*. at p. 21.)  "Nor did defense counsel's objections that the testimony lacked foundation, was speculative, or nonresponsive reasonably specify the character evidence claim now presented."  (*Ibid*.)  Similarly, in *People v. Valdez* (2012) 55 Cal.4th 82, the Supreme Court held that a defendant failed to preserve his claim on appeal where gang evidence admitted by the prosecutor constituted inadmissible character evidence.  "Here, in objecting to the gang-related evidence, defense counsel neither mentioned Evidence Code section 1101 nor asserted that the evidence constituted inadmissible character evidence.  Defense counsel did make various *other* objections to some of the evidence in question, including that it was irrelevant, cumulative, lacking in foundation, or prejudicial.  However, these objections were insufficient to preserve for appeal the claim that the

24

evidence was inadmissible under Evidence Code section 1101, subdivision (a)." (*Valdez*, at p. 130.)

During defendant's first trial, Jane Doe testified she was born in January 2000 and was 17 years old. That testimony proved she was a minor during the period alleged in the information, April 15 to 25, 2017. But, as stated *ante*, the trial court declared a mistrial on count 1 and two other counts when the jury deadlocked. Jane Doe did not testify at defendant's retrial. Instead, Corporal Lefler testified that he interviewed Jane Doe after the April 25, 2017 raid at the Ontario hotel and was able to determine her age at the time. When Lefler testified that Jane Doe was 17 years old, defense counsel said, "I'm going to object to foundation." The trial court overruled the objection, "subject to a motion to strike." The prosecutor then asked Lefler to identify a Department of Motor Vehicles (DMV) printout and asked whether it contained Jane Doe's date of birth.[12] Lefler confirmed the printout stated Jane Doe was born in January 2000. Defense counsel responded, "Your Honor, I'm still going to object to the foundation as to what was on the DMV printout." The trial court overruled the objection. Not once did defense counsel object that Lefler's testimony about Jane Doe's age or about the DMV printout was inadmissible hearsay.[13]

---

[12] The prosecutor did not mark the printout as an exhibit or move that it be introduced into evidence, but rather offered it "to clarify."

[13] In contrast, defendant objected on foundational *and* hearsay grounds when Corporal Lefler testified about the contents of a document containing incoming and outgoing text messages from Jane Doe's cellular telephone.

25

Contrary to the suggestions in his briefs, defendant's foundational objections to Corporal Lefler's testimony about Jane Doe's age would not have necessarily alerted the trial court and the prosecutor that he was also objecting on hearsay grounds. An objection of lack of foundation merely places the proponent of the evidence on notice that they might be required by the trial court to introduce preliminary facts to demonstrate a witness has personal knowledge and/or to establish the authenticity of a document the witness is asked to identify. (See Evid. Code, §§ 400-401, 702, 1401.) Because foundation and authenticity are only threshold requirements for admissibility, and even properly authenticated evidence is still subject to the hearsay rules (see 1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2018) Authentication and Proof of Writings, § 31.4, p. 31-4), it is incumbent upon the objecting party to make it known they also object on hearsay grounds so the proponent has notice they may also be required to establish the evidence is nonhearsay or satisfies a hearsay exception.

As the People contend, had defendant timely and specifically interposed a hearsay objection below, the People might have been able to meet the objection in a number of ways: (1) by producing Jane Doe to testify as to her age on the day of the raid; (2) by introducing Jane Doe's prior testimony if the People could establish she was unavailable to testify at the retrial; or (3) by properly introducing documentary evidence of Jane Doe's age, either in the form of the DMV printout or perhaps an authenticated copy of her birth certificate. It is patently unfair to both the trial court and to the People for defendant to challenge the evidence on hearsay grounds now.

26

Anticipating we would find his hearsay claim forfeited, defendant contends his trial attorney rendered ineffective assistance of counsel by not interposing a hearsay objection. "To prevail on this claim, defendant must show, among other things, that his 'counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.' [Citation.] In evaluating his claim, we 'defer[] to counsel's reasonable tactical decisions' and presume that 'counsel acted within the wide range of reasonable professional assistance.' [Citation.] Thus, defendant '"must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"'" (*People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

"'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' [Citation.] For this reason, claims of ineffective assistance of counsel 'are ordinarily best raised and reviewed on habeas corpus.'" (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1051.) "'""Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence.""'" (*People v. Rices* (2017) 4 Cal.5th 49, 80.)

Defendant argues, "there could be no satisfactory explanation for failing to adequately object to errors pertaining to the most critical issues in the case." We are not convinced. It is not entirely clear that the question of Jane Doe's age, and the fact she

27

was a minor, *was* a critical issue in this trial. Defense counsel moved for a directed acquittal at the close of the People's case-in-chief, but he did not challenge the sufficiency of the evidence on the element of count 1 that Jane Doe was a minor. And, during closing argument, defense counsel said with respect to that element, "I don't think that one is in dispute. We heard from multiple witnesses that Jane Doe was under the age 18 at the time." Instead, counsel argued there was insufficient evidence from which the jury could find beyond a reasonable doubt defendant persuaded Jane Doe to be a prostitute.

And, there *is* a satisfactory explanation for counsel not interposing a hearsay objection. As stated, *ante*, had counsel timely interposed a hearsay objection, the prosecutor had numerous ways to potentially meet the objection and prove Jane Doe's age with admissible evidence. Defense counsel might have reasonably concluded it was not worth the time and effort to make an ultimately futile hearsay objection. (See *People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].)

In sum, we conclude defendant forfeited his claim of evidentiary error.

D.  *Dueñas Error.*

Defendant contends we must strike the fines and fees imposed on him at sentencing and remand for an ability to pay hearing because the trial court failed to make a finding that he had the ability to pay, in violation of his due process rights as articulated in *Dueñas*, *supra*, 30 Cal.App.5th 1157. He interposed no objection whatsoever at sentencing to the imposition of fines and fees, so the People argue he has forfeited his

28

claim of *Dueñas* error. We conclude defendant forfeited his claim regarding the restitution fine, and we find no reversible error with respect to the other fines and fees he challenges.

1. *Defendant did not forfeit his challenge to the court operations fee and criminal conviction assessment, but any Dueñas error was harmless.*

In a nutshell, *Dueñas*, *supra*, 30 Cal.App.5th at pages 1168-1169, held that a sentencing court violated the due process rights of a defendant who committed her acts out of poverty when it imposed certain mandatory fees and fines that lack a statutory exception without first making a finding the unemployed defendant (who suffered from cerebral palsy) had the ability to pay while she was on probation.

This court has already concluded in published opinions that, before *Dueñas* was decided, a defendant's failure to object to the imposition of the court operations fee and the criminal conviction assessment, without a finding of an ability to pay, did not forfeit a claim of *Dueñas* error. (*People v. Jones* (2019) 36 Cal.App.5th 1028, 1031-1034 (*Jones*); *People v. Taylor* (2019) 43 Cal.App.5th 390, 399-401 (*Taylor*).) Although several of our sister courts have concluded otherwise, we see no good reason to revisit that question here. (See *Estate of Sapp* (2019) 36 Cal.App.5th 86, 109, fn. 9 ["Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of the same undivided district or from the same division."].)

Although defendant preserved his claim of *Dueñas* error regarding the court operations fee and criminal conviction assessment, their imposition without a finding of an ability to pay, if in error, was harmless beyond a reasonable doubt. (*Jones*, *supra*,

36 Cal.App.5th at pp. 1034-1035 [*Dueñas* error subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18]; *People v. Johnson* (2019) 35 Cal.App.5th 134, 139-140 [same].) "[U]nlike the probationer defendant in *Dueñas*, it is entirely appropriate [on appeal] to consider the wages [a] defendant may earn in prison on the inability-to-pay issue. (See *People v. Hennessey* (1995) 37 Cal.App.4th 1830, 1837 . . . [ability to pay may include a defendant's prison wages]; § 2085.5 [outlining how a restitution fine balance may be collected from prison wages].)" (*People v. Jenkins* (2019) 40 Cal.App.5th 30, 41.)

"Wages in California prisons currently range from $12 to $56 a month. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1); Cal. Dept. of Corrections and Rehabilitation, Operations Manual, ch. 5, art. 12, § 51120.6, pp. 354-355 (Jan. 1, 2019) . . . .) And half of any wages earned (along with half of any deposits made into his trust account) are deducted to pay any outstanding restitution fine. (Pen. Code, § 2085.5, subd. (a); Cal. Code Regs., tit. 15, § 3097, subd. (f).)" (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Defendant was sentenced to state prison for a lengthy determinate term of 22 years eight months. Defendant will likely have the opportunity during his lengthy prison sentence to pay his $240 court operations fee and his $180 criminal conviction assessment through prison wages and gifts. (*People v. Aviles* (2019) 39 Cal.App.5th 1055, 1077 ["While it may take defendant some time to pay the amounts imposed in this case, that circumstance does not support his inability to make payments on these amounts from either prison wages or monetary gifts from family and friends during his lengthy prison sentence."]; *Jones*, at p. 1035 ["Given that the restitution fine is $300 and the assessments are $70,

30

[the defendant] will have sufficient time to earn these amounts during his [six-year] sentence, even assuming [he] earns nothing more than the minimum."]; *People v. Johnson*, *supra*, 35 Cal.App.5th at p. 139 [finding error harmless beyond a reasonable doubt because "[t]he idea that [defendant] cannot afford to pay $370 while serving an eight-year prison sentence is unsustainable"].)

   2. *Defendant forfeited his claim of Dueñas error about the maximum restitution fine.*

Unlike the court operations fee and criminal conviction assessment, we agree with the People that defendant forfeited his claim of error about the $10,000 restitution fine.

In *Jones*, this court held a defendant did not forfeit his claim of *Dueñas* error about a minimum $300 restitution fine, despite failing to object, because the sentencing court was precluded from considering the defendant's ability to pay as a compelling reason for not imposing the mandatory minimum fine. (*Jones*, *supra*, 36 Cal.App.5th at p. 1032; see § 1202.4, subd. (c).) In contrast, in *Taylor*, we concluded a defendant forfeited his claim of *Dueñas* error about a *maximum* $10,000 restitution fine by not objecting because, even before *Dueñas* was decided, the trial court had the express authority to consider the defendant's ability to pay as one factor when deciding whether to impose a fine above the mandatory minimum. (*Taylor*, *supra*, 43 Cal.App.5th at pp. 399-401; see § 1202.4, subds. (c), (d).) As in *Taylor*, the defendant here "may have concluded that, given the seriousness of his offenses and the psychological harm to his two victims, any objection to the maximum fine would have been fruitless." (*Taylor*, at p. 401.)

*3.    Dueñas does not apply to the fine imposed as part of defendant's sentence on count 4.*

Last, we agree with the People that the $96,000 fine imposed as part of defendant's sentence on count 4 is not subject to *Dueñas*'s due process analysis.

A person convicted of human trafficking in violation of section 236.1(b) "shall be punished by imprisonment in the state prison for 8, 14, or 20 years *and a fine of not more than five hundred thousand dollars ($500,000)*." (Italics added.) Contrary to defendant's characterization of his $96,000 fine, it was part of the actual *sentence* for his conviction on count 4 and not an award of restitution under section 1202.4, subdivision (q), as compensation to D.A. for the lost value of her labor. This is borne out by the record because: (1) the trial court said the fine on count 4 was "up to $500,000"; (2) the court based the amount of the fine on the "economic benefit" to defendant, and not the amount of loss incurred by D.A.; and (3) the court expressly reserved jurisdiction to award victim restitution later.

Properly characterized as a component of the core punishment for defendant's conviction on count 4, the $96,000 fine is not governed by *Dueñas*. That case only addressed the court operations fee, the criminal conviction assessment, and the restitution fine, which the *Dueñas* court said were punitive in nature and constituted "additional punishment" for a conviction. (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1164-1173.)

Whatever the merit of *Dueñas*,[14] it simply did not address whether a trial court must consider a defendant's ability to pay before imposing a mandatory fine that is the *actual sentence* for a conviction or is a *mandatory component* of the sentence for an offense, and therefore is not "additional punishment" above and beyond the sentence. "'It is axiomatic that cases are not authority for propositions not considered.'" (*People v. Jennings* (2010) 50 Cal.4th 616, 684.) We decline to extend the reasoning of *Dueñas* to defendant's fine imposed on count 4.

IV.

DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

McKINSTER
                                                                                           J.

We concur:


RAMIREZ
            P. J.


MENETREZ
            J.

---

[14] The Supreme Court granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (review granted Nov. 13, 2019, S257844) to decide the following questions: "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments? If so, which party bears the burden of proof regarding defendant's inability to pay?" (*People v. Kopp* (Nov. 13, 2019, S257844) 2019 Cal. Lexis 8371.)